Opinion issued December 17, 2020



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00837-CR

## NO. 01-19-00838-CR

———————————

**HENRY ELLIOTT BATISTE, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 10th District Court**
**Galveston County, Texas**
**Trial Court Case Nos. 18CR1642, 18CR1643**

---

## MEMORANDUM OPINION

A jury convicted appellant Henry Elliott Batiste of aggravated assault with a

deadly weapon—namely, scissors or a knife—and assault family violence by

impeding breath or circulation.[1]   The jury also found the allegations in two enhancement paragraphs "true" and assessed appellant's punishment at 50 years' confinement.  In his sole issue on appeal, appellant contends he received ineffective assistance of counsel during the guilt/innocence phase of trial.

Because appellant's issue is not supported by the appellate record, we affirm.

## Background

A grand jury indicted appellant for two offenses committed against the complainant Charell Graham: (1) aggravated assault with a deadly weapon and (2) assault family violence by impeding breath or circulation.

### *Trial proceedings*

At the time the assaults occurred, Graham was living in an apartment with her young children, appellant (whom she was dating), and appellant's sister, Henryona Batiste.  Graham testified that she and appellant got into an argument after appellant damaged her car.  Graham told appellant she wanted to end their relationship, and appellant demanded that Graham leave the apartment.  Their argument escalated. Appellant lifted Graham over the edge of the apartment balcony and told her: "You lucky these kids are on this balcony or I would have killed you."

---

[1]   *See* TEX. PENAL CODE §§ 22.01, 22.02; *see also* TEX. FAM. CODE §§ 71.0021(b), .005.

2

Back inside the apartment, Graham attempted to shower. But appellant entered the bathroom and pushed Graham's head under the stream of water from the showerhead. According to Graham, appellant was "trying to drown [her]." As Graham dried off from the shower, appellant told her that he wanted to have sexual intercourse and "pinned [her] down" on a bed and stated, "I ought to rape you." Appellant then used his fingers to penetrate Graham two or three times.

When appellant stopped, Graham got up from the bed and moved toward a wall. Graham testified that appellant then forced her back against the wall and "choked" her until she "blacked out." When Graham regained consciousness, she had fallen to the floor and required the inhaler she uses to treat chronic asthma. Appellant brought the inhaler to Graham, but, according to Graham, was still acting aggressively and "[j]ust out of it."

Graham further testified that appellant then left the room and returned with a kitchen knife. Appellant approached Graham and pointed the knife toward her stomach—touching her stomach with the tip of the knife's blade. Appellant then began to cry and told Graham to "kill him with [the knife]." Graham refused to touch the knife.

According to Graham, she did not contact the police because she was afraid doing so would further escalate the conflict. Instead, she contacted Henryona, appellant's sister, who returned to the apartment and spoke privately with Graham

3

about what had happened. Henryona told appellant to leave the apartment. Appellant refused and became aggressive, striking Graham first on her face with his open hand and then on her neck and shoulder with a closed fist. Appellant also began to choke Graham again, but Henryona intervened and pulled appellant away.

Henryona called 911, which "made [appellant] more aggressive." Appellant grabbed a pair of scissors from a child's "coloring box" and jabbed them at Graham. He brought the scissors near Graham's face and threatened to kill her.

Also, according to Graham, appellant himself called 911. Graham recalled that appellant made threats to the 911 operator and stated: "My name is Henry Batiste. And if you guys don't come get me, then I'm going to kill [Graham], and her kids, and myself."

When the police arrived at the apartment, Graham cooperated with their investigation and allowed them to photograph her injuries.[2] Graham also testified that on the night before she was scheduled to meet with the prosecutors in advance of trial, Henryona contacted her by telephone and asked her not to testify.

---

[2]     The State introduced the evidence collected from the apartment through the testimony of T. Robison, a patrol officer with the Texas City Police Department. Officer Robison testified that he photographed Graham and observed discoloration on her neck. He also collected a steak knife and a pair of scissors, which he testified could have been designed for use by a child, from the kitchen sink. His attention was drawn to those items by Henryona.

Appellant's trial counsel cross-examined Graham about discrepancies between her trial testimony and statements she made to police immediately after the assaults—including her statement to the responding officers that appellant threatened her with scissors before he choked her a second time. She acknowledged that she declined to participate in a rape examination and did not seek medical care for the injuries she sustained as a result of the assaults.[3]

Appellant's trial counsel also cross-examined Graham about her relationship with a former boyfriend, James Broussard. But when Graham was asked whether she and Broussard ever had a "domestic" incident, the State objected under Texas Rules of Evidence "404 and 608, unless [counsel] wants to open that door."[4] Before the trial court ruled on the objection, appellant's counsel withdrew the question.

Henryona testified at trial as an eyewitness to part of the events giving rise to the charges against appellant, though she stated that she did not want to do so. Henryona explained that she was at work when Graham called to tell her what had happened. She denied having a private conversation with Graham when she returned to the apartment but decided that appellant should leave—which he refused to do.

---

[3]    Graham attributed her decision not to participate in a rape examination or to seek medical treatment to a misunderstanding about the definition of rape and lack of financial resources.

[4]    These rules of evidence concern the admissibility of character evidence, *see* TEX. R. EVID. 404, and evidence of a witness's character for truthfulness or untruthfulness, *see* TEX. R. EVID. 608.

Henryona also stated that she witnessed appellant choke Graham as she called 911, so she immediately "yanked" appellant away from Graham. Henryona further testified that appellant had threatened himself with the scissors, but not Graham.

Henryona did not recall what she told the police on the night of the assaults. But after the State refreshed her recollection by showing her video recordings of her statements to police, she acknowledged that she told the police (1) she saw a knife on her dresser when she arrived home on the night of incident, (2) she saw appellant approach Graham with scissors, (3) Graham gasped for air as appellant choked and hit Graham, and (4) she had placed the knife and the scissors in the kitchen sink before police arrived.

Henryona also testified that she saw Graham strike appellant first, before appellant choked Graham, but acknowledged she did not give that information to the police.[5] Additionally, Henryona denied asking Graham not to testify against appellant, her brother.

In his defense, appellant presented the testimony of a single witness—a crisis intervention liaison for the Galveston County District Attorney's Office. The liaison testified that Graham visited her office in June 2018. The notes taken by the liaison

---

[5] Henryona testified that she attempted to subsequently disclose that information to the State when she met with prosecutors a few days before trial, but she was interrupted by one of the prosecutors at the meeting.

6

to memorialize the meeting reflected that Graham told the liaison that appellant had not "c[o]me at her with the knife in a threatening manner."

After considering the testimony of the witnesses and the evidence admitted at trial, the jury returned a "guilty" verdict as to both charges and, after finding two enhancement paragraphs "true," assessed appellant's punishment at 50 years' confinement.[6]

### New trial hearing

Appellant moved for a new trial on the ground that newly discovered evidence probably would have resulted in a different verdict had the jury considered it—specifically, testimony from Henryona that no deadly weapon was used during his altercation with Graham and about Graham's dishonesty, and testimony from Broussard that Graham had fabricated a story about an assault in the past.

A number of witnesses testified at the evidentiary hearing on appellant's motion for new trial, including Henryona, Broussard, and appellant.[7] Henryona testified that had she been asked about Graham's propensity for truthfulness at trial,

---

[6] The enhancement paragraphs alleged that, in September 2009, appellant was convicted of the felony offense of attempted robbery and, in November 2013, was convicted of unlawful possession of a firearm by a felon. The State presented evidence of these prior offenses during the punishment phase of trial.

[7] A fourth witness, appellant's older brother Richard Jones, also testified that appellant's trial counsel had refused to allow his testimony at trial. Jones testified that he wanted to tell the jury appellant was "not the criminal that y'all are making him out to be" and, though appellant had problems with women in the past, none had involved knives or scissors.

she would have described Graham as a liar. Henryona further stated that she had not seen anyone point a knife or scissors in the altercation between appellant and Graham. And that she had given an affidavit swearing to that fact and to the falsity of the charges against appellant to private investigators retained by defense counsel before trial. However, when the State cross-examined Henryona about her statements informing the 911 operator that appellant had grabbed scissors and taken them toward Graham, she refused to answer and the trial court dismissed her from the witness stand.

Broussard testified that he and appellant are friends and that he had a romantic relationship with Graham before she dated appellant. Broussard testified, during that relationship, Graham called the police on him once—which resulted in him being arrested. According to Broussard, Graham turned a knife on him and he responded by "pull[ing] one back." Broussard further stated an unidentified source told him that Graham "had pulled a knife" on another man she previously dated. In Broussard's opinion, Graham had a history of fabricating assault claims and told a "bunch of lies" about appellant at trial.

Broussard also disclosed that appellant's counsel called him before trial and they discussed everything Broussard knew about Graham, including the allegations that she had pulled knives on other people. Broussard explained that he did not testify at trial regarding those allegations because he had to work.

Appellant also testified at the hearing. He stated Graham was the instigator of their altercation—that she "started beating on" him and pulled a knife on him first. However, it did not occur to him to tell the police about Graham's alleged conduct.

Appellant further stated that he asked trial counsel to call Broussard as a witness months before trial, but counsel did nothing with the information Broussard had shared. And he had asked trial counsel, during the guilt phase of trial, to testify on his own behalf that Graham had pulled the knife first—but counsel refused and told appellant that testifying would "hurt [him] in the long run."[8] Appellant asserted he did not understand that it was his right to testify.

Appellant acknowledged the evidence, presented during the punishment phase of trial, of his status as a habitual offender. He denied, however, that trial counsel advised him that if he were to testify in his own defense the State could introduce his prior felony convictions. Appellant also stated he did not know whether his counsel had a strategic reason for advising him not to testify.

**Standard of Review**

The United States Constitution, the Texas Constitution, and a Texas Code of Criminal Procedure guarantee an accused the right to assistance of counsel. *See* U.S. CONST. amend. VI; TEX. CONST. art. I, § 10; TEX. CODE CRIM. PROC. art. 1.051. As

---

[8] Appellant's trial counsel did not appear or testify at the new trial hearing. Appellant was represented at the hearing on his motion for new trial by appellate counsel.

9

a matter of state and federal law, this right includes the right to reasonably effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Ex parte Gonzales*, 945 S.W.2d 830, 835 (Tex. Crim. App. 1997).

To prevail on a claim of ineffective assistance of counsel under *Strickland*, the defendant must prove by a preponderance of the evidence that (1) counsel's performance was deficient and (2) a reasonable probability exists that but for counsel's deficient performance, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 687, 694. Under the first prong of the *Strickland* test, we presume trial counsel performed within professional norms. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Under the second prong, a reasonable probability is a "probability sufficient to undermine confidence in the outcome." *See Strickland*, 466 U.S. at 694; *Mitchell v. State*, 68 S.W.3d 640, 642 (Tex. Crim. App. 2002).

A failure to make a showing under either prong of the *Strickland* test defeats a claim for ineffective assistance. *Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed."); *Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003) (failure to prove either *Strickland* prong defeats claim of ineffective assistance of counsel).

Allegations of ineffectiveness must be firmly founded in and affirmatively demonstrated by the record. *Thompson v. State*, 9 S.W.3d at 813. An appellant must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance or might reasonably be considered sound trial strategy. *Robertson v. State*, 187 S.W.3d 475, 482–83 (Tex. Crim. App. 2006).

In ineffective assistance of counsel cases, the record rarely provides the reviewing court with an opportunity to conduct a fair evaluation of the merits. *See Mata v. State*, 226 S.W.3d 425, 430 (Tex. Crim. App. 2007); *Randon v. State*, 178 S.W.3d 95, 102 (Tex. App.—Houston [1st Dist.] 2005, no pet.). As a result, when the record is silent as to trial counsel's strategy, we will not conclude that appellant received ineffective assistance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (quotation omitted); *Wood v. State*, 260 S.W.3d 146, 148 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ("We will not speculate to find trial counsel ineffective when the record is silent on counsel's reasoning or strategy."). In most cases, the appellant is unable to meet the first prong of the *Strickland* test because the record is underdeveloped and does not adequately reflect the alleged failings of trial counsel. *See Mata*, 226 S.W.3d at 430.

**Ineffective Assistance of Counsel**

Here, appellant raises a single, two-part issue contending his trial counsel was ineffective (1) by not allowing appellant to testify in his own behalf as to a theory of self-defense, and (2) not presenting evidence of Graham's history of assaultive conduct.

**A.    Failure to permit appellant to testify**

Appellant asserts under his first contention that his trial counsel was ineffective "because he failed to permit appellant to produce evidence in his own defense as to his justification of self-defense."  We understand appellant to be arguing that he wanted to testify during the trial as he did at the hearing on his motion for new trial—where he stated Graham pointed a knife at him first.  Appellant maintains that because he and Graham were the only two people present during the altercation, and the jury heard only Graham's version of the events, his testimony on self-defense "would have been highly relevant and . . . created a reasonable probability that the result of the trial would have different."

The defendant has the ultimate right to testify in his own defense. *See Johnson v. State*, 169 S.W.3d 223, 235 (Tex. Crim. App. 2005).  Because counsel carries the burden of informing the defendant of that right, including advising him of the advantages and disadvantages of doing so, *Strickland* provides the appropriate

framework for addressing a claim that counsel should have called the defendant to testify. *See id.* at 235–36.

In order to establish that trial counsel's assistance was ineffective on this basis, it is necessary for an appellant to demonstrate where the record shows that he asserted his right to testify *and* that his attorney failed to protect that right. *See Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005). The denial of the right to testify is a trial error, not a structural error, and thus is subject to a harm analysis. *Johnson*, 139 S.W.3d at 238. "A court assesses the effect of any alleged error by looking at the defendant's anticipated testimony, the evidence admitted at trial, the jury charge, and other factors." *Agosto v. State*, 288 S.W.3d 113, 116 (Tex. App.—Houston [1st Dist.] 2009, no pet.).

In this case, although appellant moved for a new trial, he did not raise an ineffective assistance of counsel claim in that motion. Instead, appellant based his motion for new trial on newly discovered evidence from Henryona that there was no deadly weapon used during the altercation and that Graham was a dishonest person, and from Broussard that Graham had drawn a knife in previous altercations with men she dated. It was in connection with these new trial grounds that appellant asserted he "asked to take the stand on [his own] behalf, and [trial counsel] refused[.]" According to appellant, he told trial counsel he wanted to tell "the truth

about what really happened . . . when [Graham] pulled a knife on [him,]" but counsel advised him doing so would "hurt [him] in the long run."

This testimony from appellant at the new trial hearing is the first, and only, reference in the record to appellant's desire to testify on his own behalf and counsel's advice in that regard. When, as here, trial counsel does not appear at the hearing, "an affidavit from trial counsel becomes almost vital to the success of an ineffective assistance claim." *Stults v. State*, 23 S.W.3d 198, 208–09 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). But there is no such affidavit from trial counsel in this case. Aside from appellant's own statement that his trial counsel advised him that testifying would "hurt [him] in the long run," the record is silent as to counsel's trial strategy.

When the record is "nearly bare," as here, on counsel's trial strategy for a particular course of action, we cannot speculate to find trial counsel ineffective on appeal. *See Randon*, 178 S.W.3d at 102 (holding that "nearly bare" record was inadequate to allow court of appeals to determine counsel's effectiveness); *Henderson v. State*, 29 S.W.3d 616, 624 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (refusing to speculate counsel was ineffective when record was silent as to counsel's trial strategy).

"Indeed, such speculation could just as easily support the notion that trial counsel acted reasonably and competently in making the decisions now forming the

14

basis for the appellant's ineffective assistance claim." *Stults*, 23 S.W.3d at 209 n.6. Accepting as true appellant's statement that trial counsel advised him that testifying would be disadvantageous, there are a number of reasons why counsel might give that advice. For example, if a defendant testifies in his own defense at trial, he might reveal prior convictions. *Martinez v. State*, No. 14-01-00674-CR, 2002 WL 1354238, at *3 (Tex. App.—Houston [14th Dist.] June 20, 2002, no pet.) (not designated for publication) (noting numerous reasons for not calling defendant to testify, including prior convictions and fact that many defendants make poor witnesses, and declining to find counsel ineffective for failing to call defendant to testify where record was silent as to counsel's reasoning and strategy). A strategic decision to not open the door to such potentially adverse evidence would hardly be "so outrageous that no competent attorney" would have acted in that manner in this case, particularly given appellant's prior felony convictions for attempted robbery and unlawful possession of a firearm by a felon. *See Goodspeed*, 187 S.W.3d at 392. Indeed, instead of waiting for the punishment stage to introduce appellant's prior felony convictions, the State could have introduced them at the guilt/innocence stage had appellant testified.

Or, counsel might have elected not to elicit certain testimony because trial counsel determined it would not favorably impress the jury or advance appellant's position—given that the jury charge inquired about whether appellant used a knife

or scissors during the assault and appellant's proposed testimony concerned only the part of the altercation involving a knife and did not address the allegations that he also jabbed at Graham with scissors.

Accordingly, because the record fails to shed any light on the reasons why appellant's trial counsel did not call him to testify, and in light of appellant's prior convictions and other potential reasons why counsel may have strategically determined not to call appellant as a witness at trial, we conclude that appellant has not overcome the legal presumption that his counsel acted within the wide range of professional norms by not calling appellant to testify in his own defense. *See, e.g.*, *Salinas*, 163 S.W.3d at 740–41 (holding that where counsel advised appellant against testifying because of his prior convictions, no evidence in record showed that counsel failed to protect appellant's right to testify).[9]

---

[9] *See also e.g.*, *Brown v. State*, No. 08-12-00026-CR, 2014 WL 172521, at *5 (Tex. App.—El Paso Jan. 15, 2014, pet. ref'd) (not designated for publication) (holding defendant could not overcome presumption of counsel's competence because, by not examining his trial counsel in connection with motion for new trial, defendant failed "to create a record and prevent[ed] [appellate court] from according counsel an opportunity to explain [his] actions before being condemned as unprofessional and incompetent"); *Clark v. State*, Nos. 14-10-00666-CR & 14-10-00667-CR, 2011 WL 4361483, at *5 (Tex. App.—Houston [14th Dist.] Sept. 20, 2011, pet. ref'd) (mem. op., not designated for publication) (declining to hold counsel ineffective because "[n]o part of this record . . . sheds any light on the reasons why counsel did not call [defendant] to testify").

**B. Failure to present evidence of Graham's prior bad acts**

Appellant also contends that his trial counsel was ineffective by not presenting evidence that Graham had a "history of wielding knives against previous boyfriends and then prosecuting them for assaulting her." According to appellant, his counsel was aware of this evidence but failed to timely subpoena Broussard to testify at trial. Appellant asserts this evidence would have corroborated his theory of self-defense.

Contrary to appellant's suggestion, the record does not indicate that trial counsel failed to explore the evidence of Graham's alleged knife-wielding tendency. The testimony at the new trial hearing indicated that appellant's counsel contacted Broussard before trial and discussed Broussard's knowledge of Graham and her past relationships, but Broussard declined to testify because the trial setting conflicted with his work schedule. *See Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004) (holding that to obtain relief on ineffective assistance of counsel claim based on uncalled witness, defendant must show witness had been available to testify and testimony would have been of some benefit to defense).

In addition, appellant's trial counsel attempted to elicit testimony from Graham on cross-examination about whether she had been involved in a "domestic incident" with Broussard, but counsel's question drew an objection from the State that the testimony was inadmissible character evidence, "unless [counsel] want[ed] to open the door." In response to the State's objection, appellant's trial counsel

17

withdrew the question and did not elicit any further testimony about Graham's alleged assaultive conduct toward Broussard or any other former boyfriend.

The record is silent as to trial counsel's reason for withdrawing the question in response to the State's objections and as to what counsel might have "open[ed] the door" by continuing with this line of cross-examination. Without some explanation of the strategic decisions made by his trial counsel, appellant cannot rebut the legal presumption of competent counsel, and we are unable to conclude that counsel's assistance fell below prevailing norms. *See Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002) (defense counsel should be given opportunity to explain actions before being condemned as unprofessional and incompetent); *see also Anderson v. State*, 193 S.W.3d 34, 39 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (record did not support ineffective assistance claim where no evidence was offered to explain counsel's reason for failing to present mitigating evidence).

Having concluded that appellant has not satisfied the *Strickland* test with respect to either of his complaints about his trial counsel's performance, we overrule appellant's sole issue on appeal.

## Conclusion

Accordingly, based on the record and arguments presented to us, we affirm the judgment of the trial court.

Terry Adams
Justice

Panel consists of Justices Goodman, Landau, and Adams.

Do not publish. TEX. R. APP. P. 47.2(b).